Thank you, Your Honors. Melanie Parteau on behalf of plaintiffs' appellants, F.E.V. and Antoinette Sanchez. May it please the Court. Your Honors, when encountering a suspect, it's very likely that most officers will have some fear that the individual whom they're about to encounter may be armed or will pose some threat. But aside from that subjective fear, in order for that kind of fear to justify any use of force, there must be objective facts that support a finding that that fear is reasonable. So who did the shooting in this case? Officer Wyatt did the shooting in this case, Your Honor. Where was he when the shooting occurred? He was in the car with the decedent when the shooting occurred. And what was going on? And why did he shoot the decedent? Well, the reason he claims that he shot the decedent was because he was afraid that he was going to be ejected from the car or that there was going to be some car crash that was going to cause him injury. And so without warning, he pulled his gun out from where it was holstered and shot the decedent point blank in the head. Had he not tried to stop the driver of the car? While he was in the car, he claims that he did tell the driver to stop several times. And he also claims that he attempted to slap the gear shift into neutral or stop. And why isn't he in imminent danger under those circumstances? Well, that's not necessarily the only relevant consideration here, Your Honor. I think that there is a dispute as to whether or not he is in some danger in that particular circumstance. But plaintiff's position is that that shooting is unreasonable for two reasons. The first is that the court needs to take into consideration all of the objective facts that led up to the shooting, not just what was going on at the moment that the shooting took place. Our position in that regard is that the district court, Judge Anderson, was incorrect when he rejected plaintiff's unconstitutional provocation theory pursuant to Alexander v. City and County of San Francisco and Billington v. Smith. And then the second reason we believe the shooting was unreasonable is because he didn't give the decedent any warning. There was time for him to deliberate and give some warning before he shot the decedent. And there are disputes as to- Elaborate. What do you mean, give him some warning? That he was going to use deadly force against the decedent, Your Honor. In other words, you believe that the law mandated that he say, stop the car or I'm going to shoot you? Yes. I'm not trying to make light of this. I'm wondering what you mean. No, I totally understand. This Court's decision in Doral v. Rutherford mandates that a warning that force is going to be used is the kind of warning that is required, not just stop or don't do that. I don't remember that case of somebody being in a moving car. Well, that case did not involve somebody being in a moving car in that case. I believe the individual was shot with a lead-filled bean bag. Nevertheless, this Court did require that the warning requirement consists of a warning that the kind of force that was about to be used was going to be notified to the person. And we also have the other officer, Officer Ellis, I believe? That's correct, Your Honor. And he's trying to stop this process from outside on the driver's side, is that correct? That's correct, Your Honor. Officer Ellis' conduct goes to our unconstitutional provocation theory. Their plaintiffs believe that, again, all of the- And before you get to the provocation theory, with respect to trying to stop the car, isn't Ellis also, isn't his testimony relevant as well? Yes, his testimony is relevant. Officer Ellis was standing on the driver's side of the car. After, you know, a series of observations, Officer Ellis reached in through the car when it was in a stopped position, placed the decedent in a carotid restraint. At that time, Officer Wyatt crawled in through the passenger side of the vehicle, beat the decedent in the arm with a flashlight, then proceeded to punch the decedent in the face several times. When Officer Ellis, on the driver's side of the car, believed that the car was about to move forward, Officer Ellis withdrew from the vehicle and beat the decedent in the back of the head with his flashlight. So both officers are trying to get the decedent to stop moving the car. At some point- And the driver is certainly under notice that he's being told not to do it. Yes, Your Honor, that's correct. At some point during the incident, the officers do turn their attention in attempts to get the decedent to stop the car. Nevertheless, what's crucial here is what led up to the decedent moving the car forward in an attempt to flee what we believe was an unreasonable and excessive amount of force that was already being applied to him. Elaborate on that. Sure. So as we're told, and as this Court must consider all of the objective circumstances, we have to first consider, for example, the severity of the crime at issue as the first grand factor. The only crime or infraction that the officers had observed was a potential traffic violation. They didn't pull him over when they saw the traffic violation. They were otherwise engaged. Later on, they saw the car. They went up to the car, approached the car, and then they started seeing all this movement and stuff with his hands inside the car. They observed the decedent at the gas station. He wasn't doing anything suspicious. They ran the plates of the car. It wasn't reported stolen. There were no warrants or wants associated with the vehicle. They watched the decedent exit the gas station. They followed him. He wasn't committing any traffic infractions or violations. Just a moment. They did pick up information that the car, because of the plate, was used in a drug situation, was it not? I don't believe that there's anything in the record to indicate that, Your Honor. They followed the vehicle. They didn't observe any additional traffic violations. They put their lights on. The decedent pulled the car over within 200 feet. Officer Ellis claims that he never saw the decedent reaching around in the car, but the car was well lit. And when Officer Wyatt commanded the decedent not to move, the decedent complied. The officers then state that they observed both of the decedents' hands in his lap. One of his hands, his right hand, was in a fist. The other hand was either in his lap or in between the seat of the car and the door. Well, if you look at the excerpt of record, it says the officers' suspicions raised by the prior encounter. They ran the plates and found out that the van had been in a prior narcotics stop. I apologize, Your Honor. That's not my recollection. Nevertheless, I don't believe that that fact changes the analysis here. The car, the van isn't stolen, and they don't know there's no outstanding want or warrant for the car. They made an illegal left turn, and then they saw it weaving in the lane. Which the officers admit is not a traffic violation. Right. But they pulled it over. They pulled it over. The decedent's compliant. And the only resistance at that point is the fact that the decedent is refusing to open his right fist, which Officer Ellis claims he can see protruding from a plastic baggie that he believed contained contraband, and then the decedent's left hand, which at times was in his lap. The officers could see there was no weapon in it and at times was in between the seat of the car and the door. That's the point, Your Honors, that Officer Ellis reaches in through the driver's side door and places the decedent in a carotid restraint. A carotid restraint is not a low-level use of force. A carotid restraint is a significant level of force. Its intention is to render the suspect unconscious. The risks associated with a carotid restraint are brain damage, heart attack, and stroke. And so although some force may have been permissible in order to compel the decedent to comply at the time the carotid restraint was applied, the carotid restraint in and of itself certainly was excessive. And in any event, there are disputed issues. We believe that the jury should be able to decide whether or not the carotid restraint in and of itself was excessive. Because that's the case, plaintiffs rely on their unconstitutional provocation theory. We know from this Court's decision in United States of America v. Spann in 1992 that a person has a right to repel excessive force by a law enforcement officer in self-defense. So at the point that the decedent is placed in a carotid restraint, which we again contend was an excessive use of force, and the decedent starts flailing his arms around and makes an attempt to drive away, that is a reasonable use of force, we believe, that the decedent employed in order to get away from the excessive force being used upon him. What we know from Alexander v. City and County of San Francisco, as well as Billington v. Smith, is that if a police officer commits a constitutional violation, and that constitutional violation in turn creates the need for an officer to use what would otherwise have been a defensible use of force, that officer is liable for what otherwise would have been a defensible use of force. So our position is simple. Because there are disputed issues of fact as to whether or not the carotid restraint was excessive, there are disputed issues of fact as to whether or not Officer Wyatt would be liable for the deadly force that he used against the decedent. Whether you believe there are material issues of fact as to whether his fear of being in the car and ejected from the car were reasonable or not. Was there any evidence in the record regarding the carotid restraint and whether that was an approved or disapproved tactic by this police department? Your Honor, I don't believe that there is any record evidence in the record that says whether it was approved or disapproved by the department, but there is evidence in the record that explains the nature of the carotid restraint and its level of force. I remember there was at one point in LAPD when they stopped using the carotid restraint. They did. It's very interesting to track this stuff, because before Tennessee vs. Garner, to put it in kind of a weird way, police gunned down everybody. And then they were told you can't gun down everybody, you've got to come up with a different way of doing it. So LAPD, for example, came up with a carotid restraint. Well, then a whole bunch of people died under the carotid restraint, so it was banned. And they went to nightsticks. Well, then after Rodney King, then the whole nightstick thing was up in the air, and tasers are being attacked right and left, and beanbag guns are being attacked right and left, and glue guns and stuff like that. So it's just interesting to follow, and I was curious whether the carotid restraint by this department had been banned. Was it a banned tactic? I don't believe it was. And now you turn on television, and idiots all over the place are putting carotid restraints on each other right and left, and they're calling it sport. That's true. And I think that that definitely sheds light as to why there is somewhat of a sliding scale in terms of what kind of force is appropriate to use under certain circumstances. It's important also to note here that the Ninth Circuit has determined in cases where the only crimes that the decedent or the suspect was committed of doing, misdemeanor crimes, controlling or trying to ingest controlled substances, traffic violations, low-level active resistance from arrest like the decedent did in this case, those types of crimes do not warrant the use of significant force as was used in this case. And I'd just like to direct the Court's attention to those two cases. The first is Miller v. Clark County, and the second is Salmon v. Robbins. And I think with that I'll reserve the remaining time for rebuttal. You may do so, Counsel. Thank you very much. We'll hear from the city. Good morning, Your Honors. Moses Johnson, Assistant City Attorney on behalf of the City of Anaheim and Officers Wyatt and Ellis. This is a case where counsel is trying to make a carotid restraint out as a provocation. If you look very closely at Officer Ellis' deposition testimony, what he testified to is he never admitted to doing a carotid restraint. He saw that the decedent had a plastic bag closed up in his right fist that he believed contained drugs. He also testified that the decedent put this bag up to his mouth. He was fearful for the decedent that he was going to swallow these drugs, so he reached in through the window, and instead of putting him in a carotid restraint, he's trying to control his right hand with his right hand, and he also reaches in with his left hand because the decedent's also reaching between his seat and his car door, and he's fearful he's reaching for a weapon. He denies it's a carotid restraint. Correct. The only evidence that plaintiff has is Officer Wyatt on the other side who couldn't tell exactly what was going on, assumed that it might be a carotid restraint, but the officer doing it himself says, that's not what I was doing. I was trying to stop the decedent from swallowing the drugs. Is the carotid restraint an approved practice by the department? You know, Your Honor, I don't believe so, but that's not in the record, and I'll be honest with you, I don't remember exactly off the top of my head. I'd be more than happy to find that out for you, though, if you'd like. Darryl Gates banned that in LAPD when he was the chief 30 years ago. But I think it's a red herring here because Officer Ellis never says he's doing that. He's trying to stop the decedent from swallowing drugs, which if he had done that, he potentially could have died from it. The other thing Officer Ellis says is, as he's fighting with the decedent, he sees him attempting to slap the steer column to knock the car into drive, and he's not able to stop him from doing that. So when he's afraid and sees the car start to go forward, he immediately extracts himself from the car, and as the car and the van, the decedent stomped on it and it took off. Wait a minute. I have real trouble with that. The van wound up traveling 50 feet. According to Plano. According to the district court. That's what the court cited in the record. If you're going to tell me the court's wrong, then we've got problems with the summary judgment. The district court recited that the van had traveled 50 feet. I agree. That's what he said in his order. The van traveled 50 feet. Indeed, the district court calculated it as being something less than 4 miles per hour, which isn't anybody's idea of stomping on it. Your Honor, what Plano did is they looked at Officer Wyatt's estimates. They took the shortest numbers as far as distance and time, and then they did a mathematical calculation. We all drive cars, Your Honor. Isn't there a difference between 4 miles per hour and 40? Yes, Your Honor. I agree. Do you think Officer Wyatt would be familiar with that distance difference? Sure. Well, if he's saying it's 40 miles per hour and the car's actually traveled 50 feet, doesn't that cast a cloud on his credibility? It didn't travel just 50 feet. I agree. That's what the district court said. Well, can I accept your proposition that it's different, if what we're reviewing is a district court statement that it was 50 feet? Your Honor, I went through Plano's citations to the record very carefully, and I tried to, in my brief, very neutrally lay out to the court what each officer actually said in their deposition testimony, not the spin that Plano wanted to put on it. Well, Plano's entitled to put spin. This is a summary judgment where the victim can't testify for himself. I agree. And we've got, I mean, you've already discounted what one officer said with regard to the restraint. Now you're apparently discounting what the other officer said with regard to the acceleration of the car, and we're supposed to conclude there's no genuine issue of a material fact? I'm not discounting what the officer said. What I'm trying to argue, Your Honor, He stomped on it. True. And the district court told us the car traveled 50 feet. That suggests to me that he didn't stomp on it. The district court did say in his order that the car only went 50 feet. Officer Wyatt testified in his deposition testimony that he felt that the decedent stomped on it. I tried to lay out for you both time and distance. If a car is traveling 40 miles an hour, it covers more than 50 feet in less than a second. This happened in a matter of seconds, Your Honor. And, Officer Wyatt, What it says is the car wasn't going at 40 miles an hour. He didn't stomp on it, it suggests to me, or at least there's a pretty legitimate argument for saying that the officer is wrong with regard to that fact. Wow. And that's a critical fact because that's the key. I mean, what else was there that put the officers in reasonable fear of their or anybody else's safety? No gun was ever found, right? No gun was found. I never testified that they saw a gun. No one ever testified that they saw a gun. They saw a plastic bag. Correct. Not a gun. And they saw it reaching. Your Honor, what did the officer know at the time he pulled the trigger? He knew he's trapped inside this van. This van is going down the street. Whether it's going 25 miles an hour or 40 miles an hour, Your Honor, I don't think it's relevant. About 3.4 miles per hour. I don't agree with that mathematical calculation. But that's what the district court said. You're not going to help us if you don't stick with him with the record. I agree. We're not a jury. I understand. And I agree that's what the district court said in its order. You better stick with it, then. Let me explain, though. I don't think it's that relevant how fast the car was going, and here's why. You accept what the district court said, and you don't believe. I think I'm stuck with it. But here's the crux of it, though. The officer knows he's stuck in this car. He is afraid what's going to happen down the road. He's ordered to defend at the stop. He ignores him. He reaches over to try to turn the car off. He hits his hand, excuse me, slapped away two or three times. He's not seat-belting. He's afraid that the decedent is going to crash the car and take both of them out. And the car does end up crashing. That's the only way he can stop the car after he shoots the decedent. There's one street. This is a key intersection. It only goes two short blocks, and then there's a school at the other end. He's afraid as his car continues to go down the road, they're going to crash into that school. What time is it? It's 2 in the morning. And they saw the decedent weaving down the road when they started to follow him from the gas station. So they're thinking, you know, maybe potential DUI. Weaving within a lane. I mean, that's not a lot of weaving. I understand. They acknowledge there's no violation based on that. But he had almost crashed into them making a left turn. They were both in opposite lanes to make a left turn. They were in the number two left turn lane. And he veered in front of them, and Officer Ellis had to brake aggressively to avoid being hit. They went through their other call, and then they came back and they decided to watch him. They see Weaving. They turn on their lights and siren. He continues for another 200 feet, makes a right turn on the next street, Bond. He goes so far, he almost hits the curb on the opposite side. So he's driving on the wrong side of the road. So there's several vehicle code violations. They go up. What we're trying to focus on, though, is what is the threat that the officers perceived that justified the use of deadly force? The threat that Officer Wyatt feel is that the decedent was using his car as the deadly weapon and that he would crash the car and either seriously injure him or kill him because he was trapped in the car. He wasn't seat belted. He ordered the decedent to stop. He ignored him. He tried to turn the car off. He slapped his hand away two or three times. He felt like, this guy's not going to listen to me, and my life's in danger. I have no time. He didn't want to be taken out to the middle of nowhere. For all those things to have happened is going to take a whole lot longer than it would take the car to travel the distance that it traveled and the time that was available. That just goes to suggest the car really wasn't going that fast. And that returns me to the question. So what exactly is the danger? If we take as a given what the district court said, that the car was traveling at 3.4 miles per hour, are the inferences you've explained that the officer had sufficient to justify the use of deadly force? If you're sitting in a car going three miles an hour, are you at such risk? The inference is, even if you take the district court's calculation as correct, it doesn't take very long to get a car going up to 50 miles an hour, even if you assume that he's only going like five miles an hour at the time. Most cars can go zero to 60 in five seconds. You've got a hotter car than I do. I only drive a Prius, Your Honor. But my point is, any car, and this was a Mazda MPV minivan, can go pretty fast in a short distance, and plus these were two short city blocks with a T intersection with a school at the very end. How far did the van crash from the initial encounter when it was stopped? The calculations that I made, and I gave you in the record from looking at the officers, both with their depositions testimony, is I believe it was 100 or 220 feet, not a mere 50 feet. Is that in the record, the 120 figure? I gave you citations to Officer Wyatt's estimates as to time and distance. Yeah, but who testified to the 120 feet? I believe it was Officer Wyatt. Okay. And I laid out in the record those different distances in my brief where I recited the facts. I can find them. Give me just a second. Photographs of the crashed van? I don't believe I put photographs in the record, but I can tell you it was a significant crash. I believe that car was pushed, and I believe I cited this in the record, or it's at least in the deposition testimony that's part of the excerpt, that the car they hit got pushed forward 20 feet. Officer Wyatt, which I know is in the record, he lost control of his gun. It fell out of his hand, the crash was so significant. And then when Officer Ellis, who followed them, came up, he found the plastic bag that the decedent had originally been holding in his right hand outside the van on the ground. So this was a significant crash. Counsel, I'm troubled by the shot to the head in the first instance. Is that something we should consider in terms of alternatives that might still have been viable at that stage? Well, under this Court's cases, and I know it's one of the factors listed in the standard during Instruction 9.22, but under Scott v. Heinrich, what you have to focus on is what this officer did at the moment, and fearing for his life, reasonable. Not could he have done something else. Plaintiff would probably like you to believe, well, instead of pulling out his gun, he could have used some other tool on his belt. Well, he had been using other means. He was hitting him with something. I believe he used his flashlight, and he hit the back of his arm, trying to get him to stop fighting with what he perceived with Officer Ellis. But remember, just before he shot, he did two things. He told him to stop. That was ignored. He tried to reach over and turn the car off. He got his hand slapped away two or three times. I guess it's possible he could have taken his flashlight and whacked him on the head, but what good would that have done him? It wouldn't have made him stop the car. So he felt at that time, he's using the van as a deadly weapon. I have to respond with deadly force. How much time passed between the vehicle starting to move and the fatal shot, between which he had the warning and the hitting? Officer White estimated it was about ten seconds. And I cited to that in the record. But, again, it's an estimate. And that, I think, is where the district court picked up the figure. Ten seconds, and his testimony was the van had traveled 50 feet by then. I believe what he actually said in his deposition testimony, which I believe I cited to in my brief, was it was 50 to 100. Plaintiff took 50. Well, I'll read your brief. Within ten seconds and after traveling forward approximately 50 feet, Wyatt withdrew his duty weapon with his right hand, leaned back to his right, extended his right arm out, and shot Gonzalez. That's correct. That's what I do say on page 19. If we're talking ten seconds and the van's traveled 50 feet, the district court may have been wrong in misstating how far the van went after that because the van did travel after that, and your brief outlines that. Right. But it means up to ten seconds past, the car had traveled 50 feet. That's 3.4 miles per hour. That's not a car racing away. But, Your Honor, you're assuming a car travels at the same speed. I'm not a physics major, but I know things accelerate. Forty miles an hour, a car travels nearly 60 feet in a second. If this episode took the time that you described, you know that didn't happen in a second. And you know the car wasn't accelerating that rapidly. It doesn't get zero to 40 in one second. Oh, yeah. It would take more now. So I understand. We look at it from the officer's perspective. But I've got to say, I have difficulty understanding the factual scenario as an undisputed fact that makes it so clear that the officer had a reasonable fear. If the car is going at three miles an hour, as the district court says, I don't know, sitting in the front seat, I'm afraid that something bad's going to happen to me immediately. Okay. But all of these numbers were based upon estimates. You have to remember, in these officer-involved shootings where someone dies, the officer almost has tunnel vision and time and space get totally distorted. I understand that. But this is a summary judgment. I agree. And we can't encourage you to improve the testimony of your officer. I mean, we've got an inconsistency in his testimony. I'm not trying to improve his testimony. What I tried to do in laying out the facts was look at his actual deposition testimony and tell you what he really said. He's giving estimates based upon something that happened, I think, two years before his deposition was taken. But he said the van was traveling 40 to 50 miles per hour. That was his perception. And that's just not possible. It just isn't. It was going more than three miles an hour, Your Honor. Okay. I think we have to leave it there, counsel. Your time has expired. Thank you. Ms. Bartow, you have some reserve time. Thank you, Your Honors. First, briefly, with respect to whether or not the control hold was, in fact, a carotid restraint or not, although it is true that Officer Ellis denies that it was a carotid restraint, as if it is prohibited by his department, I think we would expect he would deny that he applied a carotid restraint. But Officer Wyatt did see what was going on inside the car, and during his deposition testimony he clearly said that he thought he saw Officer Ellis applying a carotid restraint. Second, I have a lot of respect for Mr. Johnson, but I don't believe that whether or not the carotid restraint was being applied as a red herring in this matter. We believe that it's very important because it indicates the level of force that was used at a time when we believe there was no reasonable belief that the decedent posed a grave enough risk of harm to justify the use of that level of force. Well, I think the other side says, among other things, it was harm to himself. If he ingested narcotics, it could be lethal. Okay. Is there anything in the record that supports that? Is that what the officer said, I was trying to stop him from killing himself? I don't remember that that's what the officer said. I suppose that it's possible. My recollection of the record is that the officers were concerned that he had made a quick gesture from his lap to his mouth, and they thought that he was trying to destroy evidence of contraband. Either way, even if the officer was trying to prohibit or prevent a mortal injury that the decedent was going to self-inflict, I wonder why the officer would use the kind of force that would likely inflict the same kind of injury that he was trying to prevent. That's not unreasonable. I mean, if he acts in the first instance, hitting the arm or something, to prevent the ultimate victim from harming himself, but the victim reacts in a way that puts the officer in reasonable fear of his own life, well, a game has changed. That's correct. I take it you accept that if the officer was reasonably in fear of his safety, of his life, the case law permits him to take the action that he took. Absolutely, Your Honor. The third point that I'd like to make briefly, just with respect to the velocity of the truck, the 10 seconds wasn't actually Officer Wyatt's lowest estimate. In his deposition testimony, he said that he believed that the amount of time that transpired between the time the car started moving forward and the time the shots were fired was 5 to 10 seconds. Giving Officer Wyatt the benefit of the doubt and the 10-second time period, that's the time that we selected in doing our calculation and coming up with the 3.4 miles per hour. Also, the contention that Officer Wyatt reasonably believed that he was trapped inside the van is contradicted by the testimony or the statements of eyewitnesses who say that they saw the passenger side of the van open as the car was rolling forward. Officer Wyatt also testified that he could see both of the decedent's hands before he fired during that 10-second period of time, and that there was nothing in his hands, no weapons or anything like that. I see that my time has expired, and so if there are no further questions, I'll request that the Court reverse the District Court's ruling in remand. Thank you, Counsel. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton